# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | |
|---|---|
| PEGGY P. MORRIS,      ) | |
|           ) | |
|     **Plaintiff,**     ) | |
|           ) | |
|     **v.**     ) | **CAUSE NO. 1:09-CV-00099** |
|           ) | |
| **MICHAEL J. ASTRUE,**     ) | |
| **Commissioner of Social Security,**     ) | |
|           ) | |
|     **Defendant.**     ) | |

## OPINION AND ORDER

Plaintiff Peggy Morris appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Morris applied for DIB on May 25, 2004, alleging that she became disabled on September 1, 1999. (Tr. 83-88.) Her date last insured for DIB was March 31, 2006 (Tr. 81), and thus she must establish that she was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

The Commissioner denied Morris's DIB application initially and upon reconsideration, and Morris requested an administrative hearing. (Tr. 55-56, 62-71.) On December 19, 2006, Administrative Law Judge ("ALJ") Frederick McGrath conducted a hearing at which Morris

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

(who was represented by counsel), her sister, and a vocational expert testified. (Tr. 718-47.)

On June 19, 2007, the ALJ rendered an unfavorable decision to Morris, concluding that she was not disabled despite the limitations caused by her impairments because she could perform a significant number of jobs in the economy. (Tr. 23-38.) The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 6-19.)

Morris filed a complaint with this Court on October 3, 2008, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Morris alleges two flaws with the Commissioner's final decision: (1) that the ALJ improperly discounted the opinion of her treating physician, Dr. David Stensland; and (2) that the case should be remanded based on new and material evidence. (Opening Br. of Pl. in Social Security Appeal ("Opening Br.") 21-24.)

## II. FACTUAL BACKGROUND[2]

### A. Background

As of her date last insured, Morris was fifty-three years old; had a high school education; and possessed work experience as a home health aide, cashier, waitress, office manager, manager of collections, laundry worker, emergency medical technician, and cental supply worker. (Tr. 81, 92, 97, 142-49, 166-68, 192-93.) Morris alleges that she became disabled due to the following impairments: major depressive disorder; borderline personality disorder; generalized anxiety disorder; obsessive compulsive disorder; possible bipolar disorder; bilateral cubital tunnel syndrome; post-right ulner nerve transposition; overuse syndrome; tendonitis; fibromyalgia; degenerative disk disease of the cervical and lumbar spine; C5-C6 disk protrusion causing mild

---

[2] The administrative record in this case is voluminous (747 pages). Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

to moderate stenosis; L5-S1 stenosis with S1 radiculopathy; bilateral upper extremity pain; migraine and muscle contraction headaches; chronic otitisexterna; allergic rhinitis; and temporomandibular joint syndrome. (Opening Br. 2; *see also* Tr. 91.)

At the time of the hearing, Morris lived with her husband in a home with at least one flight of stairs. (Tr. 732.) She testified that she cleans her home constantly, even when she is fatigued and in pain, describing herself as obsessive compulsive about cleanliness. (Tr. 734.) She also reported that she has trouble sleeping and that she often forgets things. (Tr. 730-31.) She stated that it is difficult to get going in the morning, elaborating that it takes her an hour "to take [her] medicines and to calm down." (Tr. 729.) Morris further testified that because of her severe fatigue and pain, she does not leave her home unless she has to and she no longer has friends. (Tr. 731-32.)

Morris represented that she experiences pain and numbness in her hands and arms, and in particular, a constant "very deep pain" in her right arm that worsens with use. (Tr. 724-26.) She states that she does not have "very good control" in her hands in that she frequently drops items such as cups, and sometimes has difficulty handling smaller items such as buttons or coins. (Tr. 725-27.) Morris also confided that she has experienced psychological problems her whole life but that they have recently worsened. (Tr. 733.)

Morris's sister testified at the hearing as well, stating that Morris is always negative and "cannot tolerate stress at all". (Tr. 735-40.) She reported that Morris visits her at her home regularly and that she may stay four to five hours or overnight. (Tr. 735, 737.) When visiting, Morris intersperses performing cleaning tasks with periods of rest. (Tr. 737.) Morris's sister believes that Morris's obsessive compulsive characteristics worsen her fibromyalgia because she

cannot leave cleaning tasks undone and thus works until she is exhausted. (Tr. 737.)

   *B. Summary of the Medical Evidence Concerning Morris's Mental Impairments*

In 1986, Morris admitted herself to the Caylor-Nickel Clinic after being diagnosed with depression and stayed two weeks. (Tr. 325-26.) She participated in psychotherapy for several years thereafter and was primarily treated with Lithium. (Tr. 366-83.) She was hospitalized again in 1991 after a suicide attempt. (Tr. 309.)

On September 10, 2003, Morris visited Dr. Jay Patel, a psychiatrist, complaining of physical problems and depression. (Tr. 615.) He saw her regularly from 2003 to 2006 and adjusted her medications; he assigned her a diagnosis of major depression, anxiety disorder, and possible bipolar disorder. (Tr. 597-98, 601, 604-06, 610-12.) From 2004 through 2006, she also participated in counseling on a monthly basis with Kathleen Hagerman at Dr. Patel's office. (Tr. 597, 599, 606-05, 610, 692-93.)

On August 9, 2004, Morris underwent a psychological evaluation by Barbara Gelder, Ph.D., at the request of the Social Security Administration. (Tr. 510-14.) Dr. Gelder diagnosed her with major depression, generalized anxiety disorder, and nicotine dependence, and assigned her a current Global Assessment of Functioning ("GAF") score of 50 and a past GAF of 53.[3] (Tr. 514.)

On September 9, 2004, J.P. Pressner, Ph.D., a state agency psychologist, concluded that

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

despite her long-standing psychological condition, she was capable of completing simple, repetitive tasks on a sustained basis. (Tr. 531.)  His opinion was later affirmed by another state agency psychologist. (Tr. 531.)

*C. Summary of the Medical Evidence Concerning Morris's Physical Impairments*

In 1989, Morris visited Dr. Laura Jones, her family doctor, for complaints of headaches and fatigue. (Tr. 355-56.)  Dr. Jones thought that her joint pain complaints may represent fibromyalgia. (Tr. 356.)  Several months later, Morris saw Dr. Delbert Nelson for a neuralgic consultation and Dr. James Babcock for an orthopedic consultation due to back pain. (Tr. 300-01, 352-54.)  She had moderate restriction in range of motion in her lumbar spine; otherwise the exam was normal. (Tr. 353.)  X-rays were within normal limits except for moderate degenerative changes at the lumbosacral joint, and the MRI did not show any significant abnormality. (Tr. 300.)

On March 21, 2001, Morris was seen by Dr. Theodore Chaykowski, an orthopedist, for a twenty-year history of bilateral arm pain. (Tr. 248-49.)  She reported that her elbow pain interfered with her sleep and that she was losing grip strength and dexterity in her hands. (Tr. 249.)  On physical exam, she had tenderness over the cubital tunnel, a positive Tinel's sign bilaterally, and weakness of the left hand finger abduction. (Tr. 248.)  Otherwise the exam was normal. (Tr. 248.)  He diagnosed her with bilateral cubital tunnel syndrome. (Tr. 248.)  A later MRI was consistent with mild ulnar neuropathies bilaterally and mild carpal tunnel syndrome on the right. (Tr. 254-55.)  After conservative treatment proved ineffective, Morris underwent a right ulnar nerve submuscular transposition for bilateral cubital tunnel syndrome on May 29, 2001. (Tr. 247-48.)  She did well after surgery, but by July 2002 her pain returned with her right

arm more symptomatic than her left. (Tr. 650-51.)  Dr. Chaykowski thought that Morris had generalized tendonitis rather than carpal tunnel syndrome on the right, and no significant ulnar nerve symptoms on her left. (Tr. 650.)  He believed that she was overusing her arms at home through her constant activities and therefore that further surgery would not be helpful. (Tr. 650-51.)

In May 2004, Morris saw Dr. Anil Rao regarding her symptoms of polyarthralgias and myalgias. (Tr. 260.)  She also reported feeling fatigued and that she had difficulty sleeping. (Tr. 260.)  He found that she had a fibromyalgia-like syndrome, but that she did not have any underlying connective tissue disease or rheumatological disorder. (Tr. 260.)  He diagnosed her with chronic carpal tunnel syndrome and degenerative disk disease of the lumbar spine, prescribed medication, and recommended that she participate in a low impact water aerobic exercise program. (Tr. 260.)

In June 2004, Dr. J. Sands, a state agency physician, reviewed Morris's record and opined that she could lift twenty-five pounds frequently and fifty pounds occasionally, stand or walk about six hours in an eight-hour day, sit about six hours in an eight-hour day, and perform unlimited pushing and pulling. (Tr. 494-501.)  He assigned her no postural or manipulative limitations. (Tr. 496-97.)  His opinion was later affirmed by a second state agency physician. (Tr. 501.)

On August 6, 2004, Morris was examined by Dr. David Spight, a pain specialist. (Tr. 557-60.)  On physical exam, palpitation disclosed at least eleven tender points consistent with fibromyalgia. (Tr. 558.)  His impression was diffuse myalgias/arthralgias, chronic dorsal thoracic pain, chronic low back pain, and bilateral knee pain. (Tr. 559.)  Differential diagnosis included

fibromyalgia, lumbar internal disk disruption with referred pain to the bilateral extremities, lumbar radiculopathy involving the right L5, bilateral carpal tunnel syndrome, and bipolar disorder. (Tr. 559.)

Dr. Spight saw Morris again in September and noted diminished sensation along certain dermatomes and some tenderness of the right sacroiliac joint and right lumbar paraspinals. (Tr. 549-52.) He also reviewed various imaging studies. (Tr. 550.) His impression was low back and left lower extremity pain with paresthesias, bilateral lower extremity paresthesias with right greater than left, history of bilateral ulnar neuropathies and right carpal tunnel syndrome, and probable fibromyalgia. (Tr. 551.)

In August and December 2004, Dr. Michael Wheeler and Dr. Joseph Fortin of Spine Technology and Rehabilitation each wrote a letter to the Social Security Administration, stating that Morris could perform no prolonged sitting, must change positions every twenty minutes, and could perform no prolonged standing or walking because she needed to rest every twenty minutes. (Tr. 546-47.) They also restricted her carrying and handling of objects and limited her lifting to five pounds. (Tr. 546-47.)

On October 26, 2004, Morris visited Dr. Stephen Hatch, a pain specialist. (Tr. 582-83.) She described her pain as an "eight" on a scale of "one" to "ten". (Tr. 582-83.) On physical exam, she had arm pain with myofascial tenderness and diffuse tenderness and pain throughout her body; however, there were no severe neurologic focal findings. (Tr. 583.) He diagnosed her with musculoskeletal pain, fibromyalgia, depression, anxiety, and significant family and marital distress. (Tr. 583.) He found that she did not require any invasive procedures, but simply needed to continue her current medicines, seek counseling, stop smoking, and work on physical fitness.

(Tr. 583.) He saw her again two months later. (Tr. 581.)

In January 2005, Morris visited Dr. David Stensland, a physiatrist, for complaints of hand pain (right greater than left), low back pain, and diffuse body pain. (Tr. 645-49.) A review of symptoms was positive for fatigue as well as other problems. (Tr. 646.) After a physical examination and review of her imaging results, he diagnosed her with bilateral upper extremity neuropathic pain and low back pain with bilateral lower extremity pain. (Tr. 647-48.) In his opinion, there was a significant component of neuropathic pain, and he prescribed medication accordingly. (Tr. 647-48.) He issued no formal restrictions. (Tr. 649.)

Dr. Stensland saw Morris again in March 2005, and she reported that she had some improvement with the bilateral hand paresthesias, but that the low back and lower leg pain continued to wake her up at night. (Tr. 643-44.) He thought her pain was primarily neuropathic since all of the studies demonstrated only mild abnormalities with regard to carpal tunnel and ulnar neuropathy. (Tr. 643.) He diagnosed her with bilateral upper extremity neuropathic pain and lumbar spinal stenosis with right S1 radiculopathy. (Tr. 643.)

From March through October 2005, Morris saw Michael Tindera, a physician's assistant in Dr. Stensland's practice, who diagnosed her with lumbar radiculopathy, lumbar stenosis, and cervical pain. (Tr. 626-42.) He adjusted her medications, which helped to alleviate some of her symptoms. (Tr. 626-42.) She received several steroid injections, which were only initially effective. (Tr. 626-42.) In May, Morris reported that she was unable to complete household chores in that she had to choose between dusting and cleaning the shower. (Tr. 637-38.) In June, Morris reported that her pain was an "eight" upon rising in the morning, but would reduce to a "two" over the course of the day. (Tr. 635-36.) In August, Morris reported to Mr. Tindera that

her pain was more aggravated. (Tr. 636.)  However, by September, Mr. Tindera represented that Morris had "good pain control and relatively good patient satisfaction" with her current medication regime and that there were "no specific restrictions". (Tr. 627.)

Morris saw Dr. Stensland again in November 2005. (Tr. 624.)  She reported to him that she was having one good day a week where she would try to get all of her activities done, which resulted in exacerbation of her pain the following day. (Tr. 624-25.)  Dr. Stensland saw Morris again in February 2006, and she still complained of diffuse body pain. (Tr. 622-23.)  He saw her again in May, July, and October 2006; she was tearful during at least two appointments and reported her pain was an "eight". (Tr. 616-17, 620-21, 687-88.)  He adjusted her medications due to her complaint of side effects. (Tr. 616-21, 687-88.)  No formal restrictions were given by Dr. Stensland during any of these visits. (Tr. 618-22, 624, 687-88.)

On December 8, 2006, Dr. Stensland completed a medical source statement on Morris's behalf. (Tr. 695-700.)  He assigned her a diagnosis of lumbar spinal stenosis, right ulnar neuropathy with subsequent right ulnar nerve transposition, and fibromyalgia. (Tr. 695.)  He gave her a poor prognosis, stating that her chronic condition would require "lifetime treatment for pain" and that her pain and depression are the primary limiting factors in her ability to function. (Tr. 695, 700.)  He described her symptoms as diffuse body pain, numbness in upper extremities bilaterally, fatigue, multipoint pain and swelling, and generalized muscle weakness, and that emotional factors contributed to the severity of her symptoms. (Tr. 636, 695.)  He stated that she could sit for about one hour and stand for thirty minutes; needed to take a break for fifteen minutes out of every ninety minutes; and could lift or carry less than ten pounds occasionally and more than ten pounds rarely. (Tr. 699.)  He opined that she frequently would

have symptoms severe enough to interfere with her attention and concentration to perform even simple work tasks, that she would miss more than three days of work per month, and that she could not work on a full-time basis. (Tr. 699.)

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

On June 19, 2007, the ALJ rendered his decision. (Tr. 23-38.)  He found at step one of

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

the five-step analysis that while Morris earned some income after her alleged onset date, the work she performed was not at a sustained level sufficient to constitute substantial gainful activity. (Tr. 25.) At step two, he concluded that Morris had the following severe impairments: fibromyalgia, a back condition resulting in chronic pain, and a long-standing history of an affective disorder and anxiety-related disorder. (Tr. 25.) The ALJ then determined at step three that Morris's impairment or combination of impairments was not severe enough to meet a listing. (Tr. 26.) Before proceeding to step four, the ALJ found Morris's subjective complaints not entirely credible and assigned her the following RFC:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform unskilled simple, routine, repetitive work tasks at a light exertional level of work activity. This work activity would also need to be low stress with no requirement for decision making, and with only occasional changes in the work setting. Additionally, this work activity would not require a production rate pace, but instead would be goal-oriented work, and this work would not require more than occasional conversations and interpersonal interaction of a brief (10-15 minutes at a time) nature with employees, supervisors, and the public.

(Tr. 26.)

Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that Morris could not perform her past relevant work. (Tr. 36.) The ALJ continued to step five where he concluded that Morris could perform a significant number of jobs in the economy, including a food preparation individual, a folder, and janitorial-related work. (Tr. 37.) Therefore, Morris's claim for DIB was denied. (Tr. 38.)

### C. The ALJ's Consideration of Dr. Stensland's Opinion Is Supported by Substantial Evidence

Morris first disputes the reasons the ALJ gave to discount Dr. Stensland's December 2006 opinion assigning her severe restrictions and stating that she could not work full-time. Morris's assertions, however, fail to warrant a remand of the Commissioner's final decision.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and  circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(d)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."[5] *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

Furthermore, a claimant is not entitled to DIB "simply because a physician finds that the claimant is 'disabled' or 'unable to work.'" *Clifford*, 227 F.3d at 870.  The determination of disability is reserved to the Commissioner. *Id*.; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1); SSR 96-5p ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment.").  In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see* 20 C.F.R. § 404.1527(e)(3); *Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006).  "Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether the individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual

---

[5] In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

is disabled." SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8.

Here, the ALJ penned *an entire page* on Dr. Stensland's opinion, summarizing his
January 2005 to October 2006 treatment notes and his December 2006 medical source statement.
(Tr. 32-33.)  Ultimately, the ALJ decided to discount the severe limitations assigned by Dr.
Stensland in the medical source statement.  He found them inconsistent with a lack of objective
findings in the record; Dr. Stensland's statements throughout his treatment notes that Morris was
in no acute distress; and the fact that Dr. Stensland previously opted not to assign Morris any
formal limitations. (Tr. 33.)  The ALJ then assigned more weight to the state agency physicians'
opinion of Morris's limitations, which he viewed to be more consistent with the medical
evidence as a whole. (Tr. 35); *see* 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent
an opinion is with the record as a whole, the more weight we will give to that opinion."); *see
generally Dixon*, 270 F.3d at 1177 (acknowledging that a consulting physician's opinion may
offer "the advantages of both impartiality and expertise"); *Smith v. Apfel*, 231 F.3d 433, 442-43
(7th Cir. 2000) (emphasizing that a consulting physician may bring expertise and knowledge of
similar cases).

The ALJ's reasoning, at least for the most part, is supported by the record, as there are
numerous inconsistencies between Dr. Stensland's treatment notes and his medical source
statement.  For example, although his medical source statement contains severe restrictions on
Morris's ability to ambulate, Dr. Morris made no mention of any difficulty with ambulation in
his progress notes. (*Compare* Tr. 695-700, *with* 616-44.)  Rather, he consistently reported that
Morris's gait was nonantalgic; that she had no difficulty transitioning from sit to stand; that she
had normal strength, stability, and muscle tone; and that the range of motion in her extremities

was normal or nearly normal. (Tr. 616-44). Similarly, Dr. Stensland expressly stated in his treatment notes that he assigned no formal restrictions to Morris with respect to her functional abilities. (Tr. 616-44.)

The ALJ also observed that Dr. Stensland stated in his treatment notes that Morris's pain was managed quite well with medication and that she, for the most part, was in no acute distress upon examination, while he later represented in his medical source statement that she was totally disabled by pain. (*Compare* Tr. 616-44, *with* Tr. 695-700.) In that same vein, Dr. Stensland represented in his medical source statement that Morris would need to take fifteen minute breaks every ninety minutes due to pain and fatigue, but his treatment notes for the most part make no mention of fatigue. (*Compare* Tr. 616-44, *with* Tr. 695-700.) Thus, the ALJ correctly observed the many inconsistencies between Dr. Stensland's treatment notes and his medical source statement, and thus had ample reasoning to discount his severe limitations. *See* 20 C.F.R. § 404.1527; *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (explaining that a treating physician's opinion may be discounted if it is internally inconsistent); *Clifford*, 227 F.3d at 870 (same); *see generally Rudicel v. Astrue*, 282 Fed. App'x 448, 452 (7th Cir. June 19, 2008) (acknowledging that a treating physician "may want to do a favor for a patient and thus 'too quickly find disability'" (quoting *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985))); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (same).

Furthermore, it is important to highlight that the ALJ did indeed credit Dr. Stensland's diagnosis of fibromyalgia. That is, at step two he concluded that Morris's fibromyalgia was a severe impairment and later in his decision acknowledged that a lack of objective findings is generally consistent with a diagnosis of fibromyalgia. (Tr. 25, 30.) Thus, when stripped down,

15

Morris's argument simply challenges whether the ALJ erred by not adopting the severe restrictions that Dr. Stensland assigned in December 2006. Of course, in that vein, the Seventh Circuit Court of Appeals has acknowledged that in many cases fibromyalgia is *not* disabling. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (acknowledging that some people may have such a severe case of fibromyalgia as to be totally disabled from working but that most do not and the question is whether the claimant is one of the minority); *see generally Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (affirming ALJ's decision to deny benefits where the "ALJ found that [the claimant] did indeed suffer from some pain from her [fibromyalgia], but that the medical evidence did not support the extent of pain to which she complained]").

In pursuit of a remand, Morris first argues that the ALJ mischaracterized the record when he stated that Dr. Stensland did not believe that the origin of her pain was primarily neuropathic. Indeed, the ALJ did misstate Dr. Stensland's opinion in this respect. (*Compare* Tr. 644, *with* Tr. 32.) Nonetheless, it does not warrant a remand of the ALJ's decision. *See generally Sanchez v. Barnhart*, 467 F.3d 1081, 1082-83 (7th Cir. 2006) (reiterating that an ALJ's error is harmless if it "do[es] not require (or indeed permit) the reviewing court to upset the agency's decision"). The ALJ credited Dr. Stensland's diagnosis of fibromyalgia, and as discussed above, his decision to discount Dr. Stensland's severe limitations rests on sufficient factual basis to support his ultimate conclusion. *See Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) ("[The claimant] is able to point to minor errors in the ALJ's reasoning . . . . But these misreads prove to be outliers and do not indicate that the ALJ's decision lacked an adequate factual basis."). "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v.*

*Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).

Morris also challenges the ALJ's reasoning in discounting Dr. Stensland's opinion with respect to the frequent notations in his progress notes that she was in "no acute distress". As Morris sees it, her condition is chronic, not acute, and thus Dr. Stensland's observation that she was in "no acute distress" was not inconsistent with his severe restrictions. Morris's argument, however, advances mere semantics, amounting to no more than a nitpick of the ALJ's analysis. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing an ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it") (internal quotation marks and citation omitted). The ALJ was certainly entitled to consider that Dr. Stensland documented at most of Morris's office visits that she was in "no acute distress". *See generally id.* ("[T]he ALJ's analysis is amply supported by the hearing record, and [the claimant's] argument amounts to nothing more than a dislike of the ALJ's phraseology.").

Morris further nitpicks the ALJ's reasoning by asserting that the ALJ erred when stating that Dr. Stensland's treatment notes failed to make mention of Morris's fatigue, pointing out that Dr. Stensland noted in his initial evaluation that she was "[p]ositive for fatigue". (*See* Tr. 646.) Morris, however, fails to acknowledge that aside from his initial evaluation, *none* of Dr. Stensland's numerous treatment notes make any mention of complaints of fatigue, despite thoroughly documenting Morris's other complaints. Therefore, the ALJ's decision to discount Dr. Stensland's limitations on this basis is indeed supported by the record. *See generally* 20 C.F.R. § 404.1527(d)(3) (explaining that less weight will be assigned to a medical opinion that lacks supportability by the medical evidence).

Finally, Morris challenges the ALJ's reasoning with respect to his observation that Dr. Stensland never assigned restrictions prior to those identified in the medical source statement. She states that her attorney explained to the ALJ at the hearing that it is Dr. Stensland's practice to assign restrictions only when a patient is working. (*See* Tr. 721.) Yet, regardless of Dr. Stensland's purported practice, of which there is no evidence other than Morris's attorney's testimony at the hearing about his own "understanding" of Dr. Stensland's office practices (Tr. 721), the ALJ was entitled to consider that the only restrictions ever prescribed for Morris by Dr. Stensland were in response to a questionnaire posed by Morris's attorney when she was seeking DIB. *See Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) (finding that a treating physician's progress notes about claimant's ability to ambulate did not provide adequate clinical support for his later restrictions on a residual capacity form).

In sum, none of Morris's specific challenges to the ALJ's reasoning undermines the fact that the ALJ's decision to discount Dr. Stensland's severe restrictions is supported by substantial evidence. The ALJ is required to weigh conflicting evidence, ultimately deciding which evidence to believe, and this Court does not resolve evidentiary conflicts. *Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004) ("[w]eighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do"). Therefore, Morris's first argument in pursuit of a remand is unavailing.

### D. A Sixth Sentence Remand For Consideration of New Evidence Is Not Warranted

Morris also requests that the Court remand this matter to the Commissioner pursuant to the sixth sentence of 42 U.S.C. § 405(g) for consideration of a Mental Impairment Questionnaire dated February 12, 2007, signed by Dr. Patel and Ms. Hagerman (Tr. 714-17), and a Medical

Source Statement dated February 20, 2007, signed by Ms. Hagerman (Tr. 712-13). Despite Morris's assertion, a sixth sentence remand is not indicated in this instance.

To explain, the sixth sentence of 42 U.S.C. § 405(g) permits a remand "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." For sixth sentence purposes, "'materiality' means that there is a 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered, and 'new' means evidence 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997) (citation omitted); *see also Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993).

Applying this legal standard here, it is clear that Dr. Patel's and Ms. Hagerman's February 2007 documentation does not serve as a basis for remand, as Morris fails to show good cause why the information was not timely produced during the prior administrative proceedings. In that regard, the record reflects that Morris was under Dr. Patel's and Ms. Hagerman's care since September 2003 for her psychological complaints. Yet, it took *almost three years* after she applied for DIB in May 2004 to obtain Dr. Patel's and Ms. Hagerman's opinion about her mental limitations, statements penned two months *after* the hearing with the ALJ.[6] *See generally Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994) (emphasizing that the claimant bears the burden to

---

[6] Furthermore, the ALJ provided Morris with ample opportunity to submit additional evidence for consideration. At the hearing, the ALJ agreed to hold the record open for an additional thirty days, that is, until January 18, 2007, to allow Morris to submit medical source statements from Dr. Stensland and Dr. Patel. (Tr. 720-21.) On the last day of that thirty-day period, Morris submitted the additional documentation from Dr. Stensland but not Dr. Patel. (Tr. 694.) Morris then requested another thirty-day extension, until February 16, 2007, to obtain Dr. Patel's statement. (Tr. 694.) It is unclear from the record whether the ALJ granted Morris's request for the second extension.

furnish medical and other evidence that the ALJ can use to reach conclusions about her medical impairment and its effect on her ability to work on a sustained basis).

Clearly Morris's failure to timely seek out Dr. Patel's and Ms. Hagerman's opinion does not now constitute good cause. Indeed, "such a rule would amount to automatic permission to supplement records with new evidence after the ALJ issues a decision in the case, which would seriously undermine the regularity of the administrative process." *Perkins*, 107 F.3d at 1296; *see also Sample*, 999 F.2d at 1144; *Keys v. Barnhart*, No. 01 C 8334, 2002 WL 31369793, at *8-9 (N.D. Ill. Oct. 21, 2002); *Romanoski v. Sullivan*, No. 91 C 8113, 1992 WL 346417, at *8 (N.D. Ill. Nov. 19, 1992) (failing to find good cause where claimant waited until after the ALJ's opinion was rendered to seek out a psychological evaluation and offered no explanation for his delay).

Moreover, Dr. Patel's and Ms. Hagerman's February 2007 opinion does not constitute "new" evidence, as it is based on information that has long been available to Morris. That is, the mental limitations assigned by Dr. Patel and Ms. Hagerman were ostensibly derived from Morris's symptoms as chronicled in their treatment notes, which had been in existence for several years prior to the date they penned the 2007 medical source statements. In that regard, Dr. Patel's and Ms. Hagerman's 2007 documentation does not indicate, nor do the treatment notes reflect, that their conclusions about Morris's mental limitations were based on any new evidence or recently-discovered findings that were unavailable to Morris prior to the administrative proceedings. *Compare Sears v. Bowen*, 840 F.2d 394, 399 (7th Cir. 1988) (finding that a psychological evaluation performed after the ALJ's decision was new evidence as "it was not in existence at the time of the administrative proceedings"), *with Sampl*e, 999 F.2d at 1144

(emphasizing that a physician's report derived from medical evidence already in the record did not constitute new information); *see also Perkins*, 107 F.3d at 1296; *Harris v. Barnhart*, No. 03 C 3185, 2005 WL 1655202, at *15 (N.D. Ill. Apr. 26, 2005) ("Evidence is new if it is not merely cumulative.").

Furthermore, Morris has failed to show that the 2007 documentation from Dr. Patel and Ms. Hagerman is "material" to necessitate a sixth sentence remand. In most aspects, Dr. Patel and Ms. Hagerman's opinion is consistent with the RFC assigned to Morris by the ALJ. That is, the ALJ seemingly accommodated Dr. Patel's view that Morris had a fair ability to perform nearly all work-related mental activities and a poor ability to understand, remember, and carry out detailed instructions when he limited her RFC to unskilled simple, routine, repetitive, low stress work that does not involve decision-making tasks, more than occasional changes in the work setting, a production rate pace, or more than occasional conversations and interpersonal interaction of a brief nature with employees, supervisors, and the public. (Tr. 26-36.) In fact, the only portion of Dr. Patel's documentation that Morris argues is material is his assertion that she would miss more than four days of work per month. (Opening Br. 24-25.) The ALJ, however, rejected a similar limitation by Dr. Stensler. Consequently, there is not a "reasonable probability" that the Commissioner would have reached a different conclusion had this statement from Dr. Patel and Ms. Hagerman been considered. *Perkins*, 107 F.3d at 1296.

In sum, Morris has failed to show that the 2007 documentation from Dr. Patel and Ms. Hagerman is "new" and "material" and that she had good cause for her failure to timely submit it to the record during the administrative proceeding. Therefore, Morris's request for a sixth sentence remand will be denied.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The

Clerk is directed to enter a judgment in favor of the Commissioner and against Morris.

SO ORDERED.

Enter for this 27th day of January, 2010.

S/Roger B. Cosbey_____
Roger B. Cosbey,
United States Magistrate Judge
